**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| SIMO DIMIC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) No. 05 C 5452 |
| v. | ) |
| | ) Judge John A. Nordberg |
| NORTHEAST ILLINOIS REGIONAL | ) |
| COMMUTER RAILROAD CORPORATION, | ) |
| d/b/a METRA/METROPOLITAN RAIL, | ) |
| | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff is seeking to recover for an injury allegedly incurred on June 20, 2005, while cleaning railroad coach cars for defendant Metra. On that day, as alleged in his initial complaint filed three months later, plaintiff was ordered to clean double the amount of railroad cars than he was normally assigned to clean in one day. The reason for the extra work -- again, according to the initial complaint -- was that Metra was short workers that day. *See* ¶ 9. Plaintiff asserted a single claim against Metra for negligence under the Federal Employers' Liability Act, 45 U.S.C. § 51 ("FELA").

This initial complaint did not contain a lot of detail. It did not describe what the injury was (later revealed to be a shoulder injury) nor did it specifically describe how it happened. Aside from a few general allegations about an unsafe workplace, the complaint pointed to only one specific possible cause; namely the extra work required by the worker shortage. Still, the

-1-

complaint was sufficient because it sketched the outlines of the lawsuit by focusing on a particular day and by suggesting a specific theory of causation. The impression created was that plaintiff's injury arose out of the blue, acute and unexpected.

Over the course of the lawsuit, however, this initial picture became more complex. As it turns out, plaintiff had worked for Metra for many years and had suffered a series of similar on-the-job injuries. He injured his left wrist in 1997; his left elbow in 1999; and his right elbow in 2000, among other injuries. Several of plaintiff's doctors thought his injuries might all be connected to a larger problem, such as arthritis. Plaintiff believed his job was the cause of his medical problems and filed several claims against Metra, one of them resulting in a sizable monetary settlement.

Perhaps recognizing that his earlier injuries are relevant, plaintiff filed an amended complaint in April 2006 and added a second FELA claim. Plaintiff alleged that Metra knew, as early as 2002, about his medical problems and further knew that his job duties were aggravating those injuries. Despite this knowledge, according to plaintiff, Metra denied his requests to be reassigned to a less physically demanding job such as a desk job. This second claim thus broadened the time frame of the lawsuit and moved the focus to several years before the June 20th injury. It also characterized the injury in different terms. Rather than being solely an acute injury, the second claim portrayed the injury as chronic, the wear and tear over many years gradually causing damage with the June 20th incident serving as the final straw.

It is fair to say that plaintiff's two claims, while not strictly incompatible, are nonetheless in tension with each other. This tension lurks beneath the surface of plaintiff's arguments in several ways. One is causation. If plaintiff already had injuries, was the extra work ordered on

-2-

June 20th really the primary cause of his shoulder injury? This question relates to Metra's statute of limitations argument (discussed below). Another area is plaintiff's deposition testimony where he insisted, contrary to all other evidence, that his shoulder injury was new and that he had never experienced any problems with his right shoulder, or even his right arm, before June 20th (an issue also addressed below).

Presently before the Court is Metra's motion for summary judgment. Although Metra seems to believe that plaintiff was faking the injury on June 20th, and it in fact fired him several months after the accident because it concluded that he failed to own up to the fact that his shoulder injury was pre-existing, Metra now relies on two narrower arguments for granting summary judgment. The first is that both claims are time-barred under FELA's three-year statute of limitations. *See* 45 U.S.C. § 56. The second argument is that plaintiff has come forward with no evidence to show that Metra breached any duty to plaintiff.

## **FACTS**

The facts are largely undisputed and consist primarily of plaintiff's medical history in the ten years before June 20, 2005. The main piece of evidence relied on by both sides is a chronology of plaintiff's doctor and therapist visits. For each visit, there are a few lines of text, presumably taken from the doctor's notes, summarizing the visit and conclusions. This list was prepared by plaintiff's counsel.[1]

---

[1] This medical history is also extensive. By this Court's count, plaintiff visited the doctor 61 times before June 20th and 113 times thereafter.

In 1995, plaintiff started working for Metra as a trackman but switched in 1997 to the job of buildings and bridges mechanic. (DF 1.)[2] In October of 1997, while working in that job, he felt a "pop" in his left wrist. (DF 2.) Dr. Jablon operated to correct the problem and released plaintiff back to work with the caveat that he could no longer continue as a bridges and building mechanic. (DF 6-7.) Believing his wrist injury was Metra's fault, plaintiff filed a claim against Metra. Represented by the same counsel who is now representing him, plaintiff negotiated a settlement of $190,000 plus payment of medical expenses for ten years. (DF 76-77.)[3]

In May 1999, plaintiff hyperextended his left elbow at work. Dr. Jablon diagnosed him with left lateral epicondylitis and operated on the elbow. Dr. Jablon then released plaintiff to his job as a coach cleaner. (DF 14-18.)

In September 2000, plaintiff complained of pain in his right elbow. Plaintiff told Dr. Pomerance that the pain traveled up his right arm following the mopping of coach cars. (DF 20.) Both Dr. Pomerance and Dr. Jablon thought the right elbow injury was part of the same condition as the left elbow injury. (DF 21-22.)

In August 2001, plaintiff again reported that his right elbow was hurting from mopping coach cars. (DF 26.) That same month, Dr. Jablon operated on the right elbow, and plaintiff was off work for four months. (DF 27-28.) In January 2002, Dr. Jablon returned plaintiff to his job as a coach cleaner without any medical restrictions. (DF 29.)

---

[2]Facts taken from Metra's Rule 56.1 statement are cited as "DF" and those from plaintiff's as "PF."

[3]According to plaintiff, over the years, he has filed a total of five legal claims against Metra in which he sought to recover for a workplace injury. (Ex. C; Pl. Dep. at 10).

On April 15, 2002, plaintiff was mopping under a coach car seat when his left wrist twisted and he felt a "pop," one similar to the "pop" he felt in connection with his 1997 wrist injury. (DF 30-31.) After taking X-rays, Dr. Jablon talked with plaintiff about his ongoing problems with arthritis in his left wrist. (DF 32.) Surgery was performed a month later. (DF 34.)[4]

Also in April 2002, plaintiff realized that his job as a coach cleaner was causing him problems and made a request, pursuant to the Americans with Disabilities Act, for an accommodation. In this first of two ADA requests, he asked to be closer to a water source so he would have a shorter distance to carry his bucket. (DF 38; Ex. G.) Metra denied the request, stating that plaintiff never produced a medical restriction from a doctor. (DF 39-40.) On June 2002, plaintiff filed a second ADA request, asking that he be given an accommodation of a desk job or one that didn't have any lifting or heavy cleaning. (DF 41; Ex. I) Metra denied the request, again citing the lack of a doctor restriction. (DF 42-43.)

In January 2004, plaintiff complained to Dr. Jablon about his left wrist and about carrying the water bucket in his job. (DF 46.) The next month, plaintiff saw Metra's independent medical examiner, Dr. Fisher, who talked to Dr. Jablon. Neither doctor felt plaintiff should have a medical restriction, although they advised him to put less water his bucket so it would be lighter to carry. (DF 48-49.)

---

[4]Three years later, plaintiff filed a state court FELA lawsuit accusing Metra of negligence relating to the April 2002 left wrist injury. (DF 79.) The lawsuit, however, was dismissed by the state court on Metra's motion for summary judgment because the left wrist was held to be a "re-injury" of the left injury in October 1997 and therefore was covered by the release signed by plaintiff as part of that settlement. (DF 80.)

## The Month Before the Injury

Beginning around early May 2005, plaintiff saw four doctors in a short period of time -- Drs. Jablon, Foreit, Kelly, and Walsh. This period is important as it relates to the disputed issue of whether plaintiff's shoulder injury existed before June 20th.

On May 5, 2005, plaintiff saw Dr. Jablon about a pain in his right wrist. (DF 51.) Dr. Jablon referred plaintiff for an EMG which was conducted by Dr. Kelly. On May 13, 2005, plaintiff told Dr. Kelly that two weeks before he woke up with a right shoulder pain and there had been no triggering event and no relation to work. (DF 52.) In light of plaintiff's medical history, Dr. Kelly speculated whether a cervical problem might explain all his injuries. (DF 53.) Dr. Kelly diagnosed plaintiff with chronic right C5-6 and left C7-8 cervical radiculopathy. (DF 54.) On June 1, 2005, an MRI was done on plaintiff's right shoulder and indicated that there was rotator cuff tendonosis and chronic degenerative changes. (DF 55).

On June 7, 2005, plaintiff went to see his family physician, Dr. Foreit, and complained about pain in his right shoulder and neck. (DF 58.) Plaintiff had not seen Dr. Foreit in five years, and it is not clear why he began seeing him now.

Also during this same time, the exact day is uncertain, plaintiff saw a fourth doctor -- Dr. Walsh. (Ex. D; Pl. Dep. at 174.) Why plaintiff went to see Dr. Walsh is also not clear given he was being treated by several other doctors. Plaintiff explained in his deposition that he saw Dr. Walsh for high blood pressure, but Dr. Walsh ended up prescribing Vicodin for plaintiff's wrist pain. (*Id.*) This was during the same time plaintiff was seeing Dr. Jablon for his wrist pain. Dr. Jablon had already prescribed Vicodin. (*Id.* at 175.) In fact, it appears that plaintiff was taking many pain drugs during this time. In addition to the Vicodin prescribed by two separate doctors,

he was also taking Xanax for his nerves, Ibuprofen, and another painkiller called Percocet, which he got from his wife. (*Id.* at 173, 177, 182.)

## The Day of the Injury

On June 20, 2005, Metra had a shortage of coach cleaners and so plaintiff's supervisor told him he did not need to do his normal job of cleaning six cars thoroughly. Instead, he was told to only clean four thoroughly and pick up trash in the remaining eight. (DF 73.) Plaintiff says that he was mopping and then heard a "pop" in his shoulder and felt a sharp pain from his neck down to his right shoulder then down to his arm and into his right wrist. (DF 64.) In his deposition, plaintiff said there was nothing wrong with his mop or bucket and his mop did not get caught on anything when the injury occurred. (DF 65.)

In the afternoon, plaintiff went to the emergency room. The emergency room doctors did not take any X-rays and diagnosed plaintiff with a muscle pull to his neck. (It is unclear why the emergency room records (*see* Ex. B) do not also refer to shoulder pain in addition to the neck pain.) The emergency room doctors gave plaintiff Motrin and let him go home. (Ex. D; Pl. Dep. at 149-150.)

On September 7, 2005, Metra fired plaintiff for dishonesty because he had not told Metra that his neck and shoulder symptoms had arisen before June 20th. (DF 75.)

Apparently on the same day, plaintiff had shoulder surgery for impingement syndrome with a torn rotator cuff. (PF 18.) Within 12 months of the June 20th injury, plaintiff had a two level cervical fusion surgery. (PF 19.)

## ANALYSIS

Before analyzing Metra's two arguments for summary judgment, we must first comment upon plaintiff's deposition testimony. As detailed below, plaintiff testified that his June 20th shoulder injury was new, yet the medical evidence strongly undermines that testimony.

Let us review the evidence. First plaintiff's deposition testimony. Here is an excerpt from page 150 of his deposition in this case:

> Q. Did you ever – have you ever sustained any prior injuries to your neck, your right shoulder, or your right arm prior to June 20, 2005?
>
> A. No.
>
> Q. Did you ever treat with any doctor for any complaints of discomfort, pain, or injuries as related to your neck, your right shoulder, your right arm?
>
> A. No.

Later in the same deposition, counsel for Metra again asked about this issue:

> Q. Did you ever report to any doctor prior to June 20, 2005, that you were experiencing pain and discomfort in your right shoulder?
>
> A. No.
>
> Q. Did you ever meet with a doctor to discuss the symptoms you were experiencing in your right shoulder prior to June 20th, 2005?
>
> A. No.

(Ex. D; Pl. Dep. at 158-159.)

This testimony, given twice, is clear and unqualified. It is also untrue by all accounts. As summarized above, the medical evidence submitted by the parties – including notably the chronology prepared by plaintiff's own counsel -- makes clear that plaintiff complained to several doctors (Kelly and Forfeit) specifically about pain in his right shoulder a month before

-8-

June 20th. One doctor ordered an MRI taken of his right shoulder. Not only did plaintiff tell multiple doctors he had shoulder pain, he told one of them it was unconnected to work.

In addition, although not mentioned in the parties' briefs, plaintiff testified in his state court deposition that he injured his right shoulder at work in 1996 when a piece of angle iron fell on his shoulder as well as on his head and foot. (Ex. C; Pl. Dep. at 24; *see also* Ex. B (entries for 10-25-96, 10-29-96, and 11-15-96)). While this injury was many years earlier, it was not trivial. Plaintiff visited the ER and then saw other doctors later. He also hired a lawyer and received a $10,000 settlement from Metra. (Ex. C; Pl. Dep. at 29.)

Plaintiff's testimony is also contradicted in yet another way. The questions at his deposition asked not solely about pre-existing *shoulder* pain, but about any injury or pain to his *right arm*. It is hard to see how plaintiff could deny that he had any medical problems with his right arm when he had documented problems with his right wrist and elbow. In August 2001, he had surgery on the right elbow and missed four months of work because of it.

In his response brief, plaintiff's counsel does not address this issue. Counsel has not, for example, suggested that the medical evidence might be wrong, nor suggested a possible explanation of how his client's testimony could be reconciled with that evidence. Instead, counsel has essentially taken a "so what" approach, first conceding that plaintiff's shoulder symptoms existed before June 20th (*see* PF 1) and then arguing that his client can still prevail if they did.

In a strictly logical sense, counsel may be correct that he could argue that some portion of the injury was pre-existing but that it was thereafter further aggravated on June 20th. Of course,

-9-

to prevail on such an argument to a jury, counsel would have to navigate around the large problem of why his client testified so contrary to the evidence.

Putting this credibility problem to the side, a more pressing issue is whether we should sanction plaintiff for making what appears to be an untruthful statement in his deposition. In particular, as one sanction, we could simply dismiss this case with prejudice. *See Rep MCR Realty, L.L.C. v. Lynch*, 363 F. Supp.2d 984, 997-98 (N.D. Ill. 2005) ("all litigants, including those far less educated and intelligent than those involved in this case, are reasonably deemed to understand that fabricating evidence and committing perjury is conduct of the sort that 'is absolutely unacceptable.'"). However, because Metra has not moved for sanctions, nor has plaintiff been given a formal opportunity to respond, we will not further consider this possible sanction, especially given our analysis below on the merits.

**I.      The FELA Three-Year Statute of Limitations.**

Because the arguments differ as to each count, we address them separately.

**A.      Count I.**

As noted above, Count I focuses primarily on the events on June 20, 2005 and specifically refers to the extra work Metra allegedly ordered plaintiff to perform. Because the complaint was filed only a few months later, it would seem to be well within the FELA three-year limitations period. Metra argues, however, plaintiff's June 20th injury was merely a manifestation of a larger underlying condition, one that was known to plaintiff more than three years before the initial complaint was filed.

In making this argument, plaintiff seeks to fit the facts of this case within a line of cases dealing with "repetitive exposure" injuries. *See Urie v. Thompson*, 337 U.S. 163, 165-66 (1949)

-10-

(a fireman on a steam locomotive contracted a lung disease after inhaling silica dust over a 30-year period); *Tolston v. Nat'l R.R. Passenger Corp.*, 102 F.3d 863, 864 (7th Cir. 1996) (plaintiff experienced persistent problems with his knees); *Fries v. Chicago & N.W. Transp., Co.*, 909 F.2d 1092, 1094 (7th Cir. 1990) (plaintiff who worked around loud industrial noise slowly over many years began to notice hearing loss). According to the rules developed in these cases, a FELA plaintiff has a duty at some point to investigate symptoms that may have been caused by his job, and the limitations period begins when he has objective evidence that work is a *potential* cause. In other words, the limitations period may be triggered before the employee visits a doctor or before he receives a specific diagnosis that his job is the cause.

In assessing Metra's argument, a question remains: what is this underlying condition? Metra describes it as an "ongoing upper extremity" injury. (Op. Br. at 5.) By using this umbrella term, Metra seeks to make plaintiff's 2000 right elbow injury and his 2005 right shoulder injury part of one larger condition. However, we find that this argument turns on disputed issues of fact and is therefore not properly resolved through a motion for summary judgment.

To begin with, Metra's description of the injury as an "ongoing upper extremity" injury does not appear to be one used by plaintiff's doctors, nor one commonly recognized in the medical field. Still, there is some medical evidence to support the notion that plaintiff's injuries stemmed from a common underlying problem. For example, Dr. Jablon testified that he thought plaintiff's lower and upper right arm pain were "all part and parcel of the same thing that's been going on." (Ex. F; Jablon Dep. at 69.) Dr. Patel, who operated on plaintiff's shoulder after the June 20th incident, described the shoulder injury as chronic and one that likely would have

occurred at least several months before the June 20th injury. (Ex. L; Patel Dep. at 14-15.) Dr. Kelly thought that the carpal tunnel injury in plaintiff's wrist was caused by a larger cervical root problem. (Ex. K; Kelly Dep. at 10.)

On the other hand, both Drs. Jablon and Patel were not completely sure of the cause of the shoulder injury and both left open the possibility that a new injury occurred on June 20th. Dr. Patel, for example, said he did see some tearing in the rotator cuff when he operated on the shoulder. (Ex. L; Patel Dep. at 18.) Likewise, although Dr. Kelly suspected that a cervical problem was the cause, he wasn't 100% sure. (Ex. K; Kelly Dep. at 10.) It seems conceivable that the plaintiff could have had separate injuries to his elbow and shoulder. In short, the facts about the cause of the shoulder injury are unclear and disputed; therefore summary judgment for Count I is not proper based on this limitations argument.

**B.     Count II.**

Count II requires a different analysis. Here, plaintiff is complaining that Metra did not reassign him to a desk job even though Metra knew plaintiff's job duties were causing him medical problems.

It is undisputed that plaintiff made two specific requests for reassignment, one in April and one in June of 2002, both outside the three-year limitations period. Both requests were rejected, also outside the limitations period. Metra thus argues that the limitations period for Count II was triggered at this point.

We agree. As plaintiff testified in his deposition, his coach cleaner job duties never changed from 1999 until he was fired in 2005. (Ex. D; Pl. Dep. at 64.) His two ADA requests in 2002 clearly indicate that -- as of that date -- he believed his job was causing him problems and

that he needed to be reassigned. This was enough to trigger the limitations period with respect to any negligence in failing to reassign plaintiff.

Plaintiff in his response brief does not offer any persuasive answer to this argument. He points to the fact that the Department of Labor classified the general job of coach cleaner as a medium classification, and he also mentions that he has submitted a report from an ergonomics expert, Dr. Andres, who opines about the ergonomic risk factors of the position of coach cleaner. (Pl. Resp. at 8-12.) But we fail to see how these facts have any relevance to whether the limitations period for the alleged failure to reassign was not triggered after Metra unequivocally rejected his transfer requests in 2002, especially given that the job remained the same until 2005. If anything, Dr. Andres' report supports Metra's argument because the report faults Metra for not implementing a training program whose purpose was to train workers to "recognize *early* signs and symptoms of musculoskeletal disorders so that they can be reported and treated *before they get worse*." (Ex. A at 12, emphasis added.) For these reasons, we grant summary judgment to Metra on Count II.

**II.     Count I -- Was Metra Negligent?**

Having granted summary judgment on Count II and the negligent assignment theory, we now address Count I and Metra's argument that plaintiff has not come forward with evidence to show Metra was negligent on that day. Metra points out that plaintiff admitted in his deposition that there was nothing wrong with his mop or bucket on June 20th, nor did his mop catch anything. *See* DF 65-66 (both facts plaintiff has admitted are true). Further, plaintiff has admitted that the equipment Metra provided on that day was "reasonably safe" and "adequate" to perform

-13-

his job and that he had no complaints about that equipment, or even the way he was trained to do his job. *See* DF 72 (another fact plaintiff has admitted is true).

Most importantly, Metra has submitted evidence to show that, on worker shortage days such as June 20th, plaintiff in fact was not given extra work. Instead of having to *thoroughly* clean *all* six cars, he had to thoroughly clean only four cars and then pick up trash in the remaining eight. (DF 73.) Plaintiff has agreed with this factual assertion in Metra's statement of material facts. The bottom line: although the nominal amount of cars was more, the overall work was the same or even less. Plaintiff confirmed this point when he testified in his deposition that he "mops lesss" on these "worker shortage" days. *See* Ex. D; Pl. Dep. at 107. Given that plaintiff claims his injury resulted from mopping, this testimony further confirms that the different duties on June 20th were not the cause of his injury.

We agree with these arguments. We have carefully reviewed the evidence submitted by the parties. The simple fact remains that the evidence is not in dispute. Plaintiff has not shown that Metra did anything wrong, aside from its possible negligence in failing to reassign him, an allegation already barred by the statute of limitations. In short, plaintiff has not pointed to facts supporting the implied argument made in his initial complaint – namely, the order to clean double cars was the cause of his injury. We therefore grant summary judgment on Count I.

## CONCLUSION

For the above reasons, defendant's motion for summary judgment is granted and summary judgment is granted to defendant on both counts. This concludes this lawsuit.

**ENTER:**

                                       _____
                                       **JOHN A. NORDBERG**
                                       **Senior United States District Court Judge**

**DATED:** _____